UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EKKEHART SCHWARZ,

                              Petitioner,

          - against -

WILLIAM CONNELLY,
SUPERINTENDENT, FISHKILL
CORRECTIONAL FACILITY,

                              Respondent.

**ORDER**

15 Civ. 1501 (PGG) (KNF)

PAUL G. GARDEPHE, U.S.D.J.:

On March 2, 2015, Petitioner Ekkehart Schwarz filed a habeas corpus petition pursuant to 28 U.S.C. § 2254, seeking to vacate his convictions under New York Penal Law, §§ 155.40(2)(a), 160.10(1) and (3), and 160.15(3).  (Pet. (Dkt. No. 1) at 1)[1]  On March 6, 2015, this Court referred the petition to Magistrate Judge Kevin Nathaniel Fox for a Report and Recommendation ("R & R").  (Dkt. No. 8)  On September 15, 2015, Judge Fox issued an R & R recommending that the petition be denied.  (R & R (Dkt. No. 19))  For the reasons stated below, this Court will adopt the R & R in its entirety, and the petition will be denied.

## BACKGROUND

### I.    FACTS

In July 2007, Schwarz, an architect, and Vasileios Giamagas, a chef, met with Niroo Yavari, a building manager, to discuss leasing space at 68 West Third Street, New York, New York, to establish a restaurant.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 81-

---

[1]  The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

85, 99; (Dkt. No. 17-4) at 97-98)  Yavarri managed the building on behalf of the owners, Mahrokh Eshaghian and Tanaz Eshaghian, and their property management company, Markwood Management.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 65-66, 80; (Dkt. No. 17-4) at 96-98, 111; M. Eshagian Testimony, St. Ct. Transcript (Dkt. No. 17-8) at 73-74, 79)

Yavari negotiated a 10-year lease agreement with Schwarz and Giamagas, and the parties reached a final agreement on or around August 1, 2007.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 85, 89, 92-93; (Dkt. No. 17-4) at 99-100, 109); (Dkt. No. 17-5) at 87-88)  Yavari, with Mahrokh Eshaghian's approval, committed Markwood Management to perform certain "owner's work" at the restaurant, including removing a brick chimney, relocating pipes and walls next to a stairwell, and installing a new cellar door.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 87-88, 95-98; (Dkt. No. 17-4) at 102, 109-11; (Dkt. No. 17-5) at 30, 89-92; (Dkt. No. 17-6) at 99, 108; M. Eshagian Testimony, St. Ct. Transcript (Dkt. No. 17-8) at 83-84)

Pursuant to the lease, the rent for the property was $16,500 a month.  Yavari granted Schwarz and Giamagas a three-month rent abatement from August through October 2007.  Moreover, the lease stipulated that, if the owner's work was not completed by September 15, 2007, the rent abatement would be extended by one day for each day that the work was late. (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 89-90, 106-07; (Dkt. No. 17-5) at 89-90)

The renovation work did not proceed in a timely fashion.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 100-01; (Dkt. No. 17-5) at 97-101; (Dkt. No. 17-6) at 3, 98)  In September 2007, Schwarz and Giamagas complained to Yavari about the pace of the renovation. (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 101-05; (Dkt. No. 17-5) at 1-4, 101)

Since the work extended beyond September, Schwarz and Giamagas were excused from paying rent for the month of December 2007 pursuant to the one-for-one-abatement provision.

Yavari forgot about the rent abatement provision, however, and believed – erroneously – that rent was due for December 2007.  Accordingly, in early January 2008, Yavari telephoned Giamagas about the non-payment of rent for December 2007.  At Giamagas's direction, Yavari went to the restaurant to discuss the matter.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 106-08; (Dkt. No. 17-5) at 4-9, 90)  During the meeting, Schwarz and Giamagas were accompanied by another man, which they introduced as "chef."  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 112-13; (Dkt. No. 17-5) at 4, 10-11, 95)

When Yavari raised the issue of December's rent, Giamagas gave him multiple copies of a letter, dated October 29, 2007, amending the lease by providing that: "if the work is not complete by November 15, 2007, I will grant you in addition to the six weeks rent-free time you are entitled to, as per our lease, an additional rent-free time of six months for a total of seven months and two weeks after completion of the work. The work is complete when the owner's work has . . . been signed off at the Building Department."  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 115; (Dkt. No. 17-3) at 4-10)  The letter also obligated Markwood Management to complete more renovation work than provided for in the lease agreement. (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 9-13)  Yavari refused to sign the letter.

Giamagas then threatened Yavari, displayed what appeared to be a semi-automatic handgun, pointed the gun at Yavari's face, and ordered him to sign the letter.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 13-17; (Dkt. No. 17-5) at 95)  Afraid of getting shot, Yavari signed the letter.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 21; (Dkt.

No. 17-5) at 16, 95)  Yavari did not report the incident to anyone.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 22-23; (Dkt. No. 17-5) at 18-20)

By early March 2008, the renovation was complete, and the first rent payment was due by April 1, 2008.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 107; (Dkt. No. 17-4) at 111)  Schwarz and Giamagas did not open the restaurant, however, nor did they pay any rent in 2008.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 36-37)  Yavari misinformed the owners that the rent was being paid.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 50-51; (Dkt. No. 17-5) at 31)

On the morning of January 20, 2009, Yavari was sitting in his office when Kakhaber Gogoladze entered. (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 54-59; (Dkt. No. 17-6) at 35-36, 41, 44-45, 48, 51-54)  Gogoladze stated that he was sent by Giamagas to bring Yavari to Giamagas's office.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 54-56, 63-64; (Dkt. No. 17-5) at 35; (Dkt. No. 17-6) at 45)  Fearing for his safety, Yavari accompanied Gogoladze.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 67, 74; (Dkt. No. 17-5) at 39, 47-50; (Dkt. No. 17-6) at 45-48)

Yavari was taken to an apartment at the corner of Washington and Hubert Streets in Lower Manhattan.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 75-81; (Dkt. No. 17-4) at 89-90); (Dkt. No. 17-6) at 57-60)

Inside the apartment, at Giamagas' direction, Yavari sat down at a table. Giamagas asked if Yavari was comfortable where he was sitting, and told him that if he was not, he could sit "over there," pointing to a wicker chair that was on top of a clear plastic tarp, next to a table, on which a burning candle and some "hand tools," including a hammer, screwdriver and pliers, were located.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 81-87; (Dkt. No.

4

17-5) at 55-62)  Yavari concluded that he was being warned that he was about to be tortured. (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 85-87)

Giamagas told Yavari that delays in opening the restaurant were Yavari's fault, and that the building had a lot of violations which Yavari was "going to have to pay for." Giamagas told Yavari that, once Schwarz arrived, he would take Yavari to Yavari's office, and Yavari would give Schwarz seven signed checks to pay for necessary construction work.  Afraid, Yavari agreed.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 87-93; (Dkt. No. 17-5) at 57, 64-66)

Schwarz then arrived at the apartment.  Yavari, Schwarz, and Gogoladze went to Yavari's office, where Yavari printed seven blank checks containing a computer-generated signature, wrote "68 West Third" on the memo lines, and gave the blank checks to Schwarz. (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 95-104; (Dkt. No. 17-5) at 66-67; (Dkt. No. 17-6) at 20-23)  Yavari did not report the incident to anyone. (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 111-12; (Dkt. No. 17-5) at 67; (Dkt. No. 17-6) at 73-74)

That same day, one of the checks that Yavari gave to Schwarz was deposited into a Citibank account belonging to "Ekkehart Schwarz Architect PC" at "28 Hubert Street." (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 99-100; Aponte Testimony, St. Ct. Transcript (Dkt. No. 17-6) at 113-24, 132-34)  The amount of the check was $25,000.  (Aponte Testimony, St. Ct. Transcript (Dkt. No. 17-6) at 122, 134)

That evening, Yavari went to the apartment at "28 Hubert Street," as directed by Giamagas.  Giamagas and Schwarz were inside.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 112-14; (Dkt. No. 17-6) at 24-25, 76-77)  Giamagas directed Yavari to fire the live-in superintendent of the 68 West Third Street building, because he complained frequently about

Giamagas and Schwarz to the "City." Giamagas said that he wanted "to take care of that problem now." (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 115-18; (Dkt. No. 17-5) at 70-71; (Dkt. No. 17-6) at 32)

On January 21, 2009, Yavari reported these events to the building's owners, their attorney and the police. (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 127-28; (Dkt. No. 17-5) at 71-73; (Dkt. No. 17-6) at 26-27, 65; M. Eshaghian Testimony, St. Ct. Transcript (Dkt. No. 17-8) at 76, 87)

The next morning, January 22, 2009, Yavari and Tanaz Eshaghian met at the New York County District Attorney's Office with Detectives Turck and Peters and an Assistant District Attorney. (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 129; (Dkt. No. 17-4) at 102-03, 111; (Dkt. No. 17-6) at 66-67); Turck Testimony, St. Ct. Transcript (Dkt. No. 17-7) at 81; (Dkt. No. 17-8) at 50; Peters Testimony, St. Ct. Transcript (Dkt. No. 17-9) at 104; (Dkt. No. 17-10) at 111) Yavari described the events leading up to the incident on January 20, 2009. (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-4) at 103-104; Turck Testimony, St. Ct. Transcript (Dkt. No. 17-8) at 51; Peters Testimony, St. Ct. Transcript (Dkt. No. 17-10) at 112-13; (Dkt. No. 17-11) 16-17)

On February 11, 2009, Schwarz deposited one of the checks that Yavari had given to him. This check was deposited into a Citibank account in the name of "G&S Restaurants, LLC." The amount of the check was $35,000. (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-3) at 100-02; Aponte Testimony, St. Ct. Transcript (Dkt. No. 17-6) at 124-26, 134-35)

On March 19, 2009, police officers arrested Schwarz and Giamagas and executed search warrants at their homes. (Turck Testimony, St. Ct. Transcript (Dkt. No. 17-7) at 91-94; (Dkt. No. 17-8) at 34-36; Peters Testimony, St. Ct. Transcript (Dkt. No. 17-10) at 76-78, 105-06,

121)  From Schwarz's apartment officers recovered a clear plastic tarp, various tools, files, and a signed copy of the purported lease amendment that Yavari had been forced to sign in January 2008.  (Turck Testimony, St. Ct. Transcript (Dkt. No. 17-7) at 103-07, 115; (Dkt. No. 17-8) at 38, 52-53)  A holstered imitation semi-automatic handgun was recovered from Giamagas's apartment.  (Peters Testimony, St. Ct. Transcript (Dkt. No. 17-10) at 87-93, 108)

Officers also recovered computers from Schwarz's and Giamagas's apartments. (Turck Testimony, St. Ct. Transcript (Dkt. No. 17-7) at 98, 108-09; Peters Testimony, St. Ct. Transcript (Dkt. No. 17-10) at 87, 101-02, 106)  The computer from Giamagas's apartment contained software associated with a GPS tracking device.  (Forames Testimony, St. Ct. Transcript (Dkt. No. 17-12) at 38-41)  Stored on that computer were files entitled "Coercive Mind Control Tactics" and "Assasin [sic] Work."  (Forames Testimony, St. Ct. Transcript (Dkt. No. 17-12) at 42-48, 62-69)  The GPS software and the "Coercive Mind Control Tactics" file were stored within the "Ekkehart" account, while the "Assasin" document was stored in a entitled "De'Vill," which was also inside the "Ekkehart" account.  (Forames Testimony, St. Ct. Transcript (Dkt. No. 17-12) at 39-42, 46, 63).

Schwarz was charged with second-degree kidnaping, first degree robbery, two counts of second-degree robbery, second-degree grand larceny, two counts of first-degree coercion and second-degree coercion.

## II.   RELEVANT TRIAL EVIDENCE AND ARGUMENT

### A.   Presentation of Citibank Records and Argument that Petitioner was "Broke"

In outlining the People's case in his opening, the prosecutor stated that the People intended to offer evidence showing that – between December 2008 and January 2009 – Schwarz and Giamagas were "virtually broke."  (St. Ct. Transcript (Dkt. No. 17-2) at 27)

7

During trial, the prosecution called Brauloi Aponte, a Citibank employee, who testified about Citibank records relating to bank accounts in the names Ekkehart Schwarz Architect PC ("ESA PC") and G & S Restaurant LLC ("G&S LLC").  (Aponte Testimony, St. Ct. Transcript (Dkt. No. 17-6) at 112-14, 118-19, 126).  The ESA PC bank records for the period between January 17, 2009 and February 17, 2009 (Exhibit 53) show an initial deficit balance of  -$366.75 and an ending balance of zero.  (Aponte Testimony, St. Ct. Transcript (Dkt. No. 17-6) at 118-20)  The G&S LLC records for the period from January 24 to March 20, 2009 (Exhibit 54) show balances of $14,200.98 and $10,910.19 in mid-January and March, respectively. (Aponte Testimony, St. Ct. Transcript (Dkt. No. 17-6) at 124-25)

In his summation, the prosecutor stated that "by fall of 2008, the restaurant still had not opened, and . . . the defendants, I submit, were almost broke.  And that is where the defendants' threats of violence really escalated."  (St. Ct. Transcript (Dkt. No. 17-16) at 70)  The prosecutor also pointed out that Schwarz had made numerous withdrawals on the ESA PC account during the January to February 2009 time period, and that by February 17, 2009, the account was again overdrawn, by $429.00.  (St. Ct. Transcript (Dkt. No. 17-16) at 100-01) Throughout his summation, the prosecutor emphasized that Schwarz and Giamagas were "broke":  "[r]emember, the defendants are broke"; "these broke men have eighty-five, a hundred nine thousand dollars pulled out from under them"; "[t]hey went from feeling like they had a hundred nine thousand dollars, to realizing they were broke again."  (St. Ct. Transcript (Dkt. No. 17-17) at 16-18)

After the summations, the trial court instructed the jury that the lawyers' arguments about the evidence were not themselves evidence.  (St. Ct. Transcript (Dkt. No. 17-17) at 38)

**B.      Giamagas's Cross-Examination of Yavari Regarding
         Statements Made During His January 22, 2009 Interview**

On cross-examination by co-defendant Giamagas's counsel, Yavari testified that,
during the January 22, 2009 interview, he admitted that there had been delays in performing the
renovation work that the lease specified was to be completed by September 15, 2007.  (Yavari
Testimony, St. Ct. Transcript (Dkt No. 17-4) at 103-04)  However, notes of the January 22, 2009
interview produced by the District Attorney's Office – denominated "Niroo Yavari Meeting
Notes, R09-007257, January 22, 2009" – reported that Yavari had stated that he "did things in a
timely manner."  (January 22, 2009 Notes, St. Ct. Records and Proc. (Dkt No. 16-4) at 55)

The jury convicted Schwarz of first-degree robbery, second-degree grand larceny
and two counts of second-degree robbery.  (St. Ct. Transcript (Dkt. No. 17-18) at 10-13, 16)  He
was acquitted of second-degree kidnapping, first-degree coercion, and second-degree coercion.
(Id.)

On February 25, 2010, Schwarz was sentenced to an indeterminate term of 5 to 15
years imprisonment for the second-degree grand larceny count, to run concurrently with a
determinate term of 8 years' imprisonment and 5 years' post-release supervision for the first-
degree and second-degree robbery counts.  (St. Ct. Transcript (Dkt. No. 17-18) at 30-31)

Schwarz appealed his conviction to the Appellate Division, First Department.
The Appellate Division affirmed the judgment of conviction and the trial court's denial of
Schwarz's Criminal Procedure Law ("CPL") § 440.10 motion, finding that

> [t]he [lower] court properly denied Schwarz's CPL 440.10 motion, in which he
> alleged ineffective assistance of counsel.  The trial record and the submissions on
> the motion establish that Schwarz received effective assistance under the state and
> federal standards. Schwarz has not shown that any of his counsel's alleged
> deficiencies fell below an objective standard of reasonableness, or that, viewed
> individually or collectively, they deprived him of a fair trial or affected the
> outcome of the case.  In particular, many of Schwarz's lawyer's alleged omissions

involved matters that were adequately pursued by the lawyers for Gogoladze and
the other jointly tried codefendant, and Schwarz has not established that his
counsel's failure to duplicate cocounsels' efforts was objectively unreasonable, or
that it caused any prejudice.  Schwarz's counsel's other alleged errors and
omissions were of minor significance.

Under the circumstances present, the prosecutor did not have a duty to "correct"
testimony by the victim that was inconsistent with an interview report.  The
interview notes were available to defendants, who had a full opportunity to use
them for impeachment purposes to the extent they saw fit, and there has been no
showing of prejudice.  Schwarz's constitutional claims relating to this issue are
without merit.

People v. Gogoladze, 114 A.D.3d 417, 418 (1st Dep't 2014) (internal citations omitted).

Schwarz submitted an application for permission to appeal to the New York Court
of Appeals.  On April 11, 2014, the New York Court of Appeals denied leave to appeal.  See
People v. Schwarz, 22 N.Y.3d 1202 (2014).  This petition followed.

**DISCUSSION**

I.   **LEGAL STANDARDS**

A.   **Review of Magistrate Judge's Report and Recommendation**

In evaluating a magistrate judge's R & R, a district court "may accept, reject, or
modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28
U.S.C. § 636(b)(1)(c).  Under 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), a party may
submit objections to the magistrate judge's R & R.  Any objections must be "specific" and
"written," and must be made "[w]ithin 14 days after being served with a copy of the
recommended disposition."  Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1)(C).

Where, as here, a party submits timely objections to an R & R, "[the district
judge] shall make a de novo determination of those portions of the report or specified proposed
findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1)(C); see also
Fed. R. Civ. P. 72(b)(3).  "[O]bjections 'must be specific and clearly aimed at particular findings

in the magistrate judge's proposal'" in order to invoke de novo review.  See McDonaugh v. Astrue, 672 F. Supp. 2d 542, 547 (S.D.N.Y. 2009) (quoting Molefe v. KLM Royal Dutch Airlines, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009)).  "[Where] a 'party makes only conclusory or general objections, or simply reiterates the original arguments,' the court reviews the R & R strictly for clear error."  Covington v. Five Points Corr. Facility, No. 11 Civ. 8761 (AT)(FM), 2016 WL 3407845, at *1 (S.D.N.Y. June 16, 2016) (quoting Rivera v. Colvin, No. 11 Civ. 7469, 2014 WL 3732317, at *1 (S.D.N.Y. July 28, 2014)); see also Edwards v. Fischer, 414 F. Supp. 2d 342, 347 (S.D.N.Y. 2006) ("[W]here objections are merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [pleadings], reviewing courts should review a report and recommendation for clear error." (internal quotation marks omitted)).

A decision is "clearly erroneous" when, "upon review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been committed."  United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006) (quotation marks and citation omitted).

As petitioner made specific objections to particular findings in the R & R, the Court has performed a de novo review.

**B.**  **28 U.S.C. § 2254 Habeas Corpus Petition**

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, a habeas corpus petition shall not be granted unless the adjudication of the claim by the state court either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding." [2]  28 U.S.C. §

2254(d)(1)-(2).

A petitioner shows that a state court's decision is contrary to clearly

applicable  federal law "by demonstrating either (1) that the state court reached a conclusion of

law that directly contradicts a holding of the Supreme Court, or (2) that, when presented with

facts that are materially indistinguishable from a relevant Supreme Court precedent, the state

court arrived at a result opposite to the one reached by the Supreme Court."  Evans v. Fischer,

712 F.3d 125, 132-33 (2d Cir. 2013) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000))

(internal quotation marks omitted).

A petitioner demonstrates that a state court decision was based on an

unreasonable application of federal law by proving that the state court "unreasonably applie[d]"

federal legal principles "to the facts of the case before it . . . involv[ing] some increment of

incorrectness beyond error."  Id. at 133 (internal quotation marks and citation omitted).

"[A] determination of a factual issue made by a State court shall be presumed to

be correct.  The applicant shall have the burden of rebutting the presumption of correctness by

clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Those seeking habeas relief face a high burden, and a reviewing court must give a

state court decision due deference.  See Harrington v. Richter, 562 U.S. 86, 102 (2011) ("If this

---

[2]  "In the AEDPA context, '"clearly established federal law" refers only to the holdings of the
Supreme Court' extant at the time of the relevant state court decision."  Jackson v. Conway, 763
F.3d 115, 134 (2d Cir. 2014) (quoting Rodriguez v. Miller, 537 F.3d 102, 106 (2d Cir. 2008));
see also Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003)).  "While [the Second Circuit] may rely
on [its] prior decisions to the limited extent that [it] ha[s] 'already held that the particular point in
issue is clearly established by Supreme Court precedent,' [it] must scrupulously avoid using [its]
decisions (or those of other circuits) 'to refine or sharpen a general principle of Supreme Court
jurisprudence into a specific legal rule that th[e] Court has not announced."  Id. (citations
omitted).

standard is difficult to meet, that is because it was meant to be."); Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (noting that § 2254's "highly deferential" standard "demands that state-court decisions be given the benefit of the doubt"). Indeed, state court decisions are presumed to be correct, and a petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Habeas corpus will not be granted "merely because there is a reasonable possibility that trial error contributed to the verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation marks omitted).

## II.   ANALYSIS

### A.   Due Process Claims

#### 1.   Alleged Use of False Evidence

Schwarz contends that the Appellate Division's decision is contrary to, or an unreasonable application of, Miller v. Pate, 386 U.S. 1 (1967), which holds that a state conviction violates Due Process where it is "obtained through the knowing use of false evidence." Id. at 7. According to Schwarz, the prosecutor repeatedly argued to the jury that he committed the charged offenses because he was "broke," when the prosecutor knew – from records regarding Schwarz's TD Bank account – that in January 2009 he had deposited $256,000 into that account. (Pet. Br. (Dkt. No. 4) at 59-60)

Judge Fox found this argument unpersuasive, because Schwarz cited no federal law proscribing a prosecutor's use of a false argument – i.e., that Schwarz was "broke" – as being violative of the Fourteenth Amendment. (R & R (Dkt. No. 19) at 12)

Claiming that Judge Fox "misconstrue[d] [his] claim," Schwarz argues in his objections that the prosecutor used false evidence when he "introduc[ed] in evidence the Citibank records," and falsely argued to the jury that Schwarz was "broke," when he knew that

13

"in January 2009, Schwarz had over $250,000 in a TD Bank account."  (Objections to R & R (Dkt. No. 22) at 6-8)

"[T]he Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence."  Miller, 386 U.S. at 7 (citing Mooney v. Holohan, 294 U.S. 103 (1935)).  "[T]o challenge a conviction because of a prosecutor's knowing use of false testimony, a defendant must establish that (1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" United States v. Helmsley, 985 F.2d 1202, 1205-06 (2d Cir. 1993).

Applying Miller, the Supreme Court has extended the proscription to "manipulation of the evidence", e.g., a prosecutor's knowing withholding or misrepresentation of the nature of proffered evidence.  Miranda v. Bennett, 322 F.3d 171, 181 (2nd Cir. 2003) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974)); see also United States v. Valentine, 820 F.2d 565, 570-71 (2d Cir. 1987) (holding that prosecutor's repeated statements declaring or implying "a consistent pattern of loans" despite inconsistent grand jury testimony on this point violated the Due Process prohibition on a prosecutor making "knowing use of false evidence," where the inconsistent grand jury testimony was not made available to defendant)).

The Supreme Court has cautioned, however, that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations":

> The "consistent and repeated misrepresentation" of a dramatic exhibit in evidence may profoundly impress a jury and may have a significant impact on the jury's deliberations.  Isolated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions.

14

> Such arguments, like all closing arguments of counsel, are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear.

Donnelly, 416 U.S. at 646-47.  Relevant to a reviewing court's analysis of whether a defendant's constitutional rights were violated is whether the trial court took steps to correct any impression that the jury could consider the prosecutor's statements as evidence in the case.  Id. at 644-45.

Here, this Court adopts the R & R's recommendation that habeas corpus relief based on this ground be denied, because the Appellate Division's decision is not contrary to or based on an unreasonable application of the legal principles set forth in Miller and its progeny.

In claiming knowing use of false evidence, Schwarz does not contend that the "Citibank records, which showed low and even negative balances around the time of the January 2009 crimes," were false or inaccurate.  (Pet. Objections (Dkt. No. 22) at 6-9)  Schwarz complains instead that the prosecutor did not present further evidence of petitioner's TD Bank account records and purchases in January 2009.  Schwarz does not contend, however, that the TD Bank records were unknown or unavailable to him during trial.  (Pet. Objections (Dkt. No. 22) at 6-9)

Miller is not applicable here.  In that case, the prosecution introduced expert testimony concerning the nature of certain stains on clothing.  That testimony was later proven to be false during subsequent habeas corpus proceedings.[3]  Here, Schwarz has not argued, much

---

[3]  In Miller, the prosecution introduced "a pair of men's underwear shorts covered with large, dark, reddish-brown stains."  "[A] chemist for the State Bureau of Crime Identification," qualified as an expert witness, categorically testified that the results of three tests confirmed that the stains on the shorts were type A blood, which was the victim's blood type.  Miller, 386 U.S. at 3-4.  The petitioner's motion for an order permitting a scientific inspection of the physical evidence was opposed by the prosecution and denied by the trial court.  Id. at 2.  A central theme of the prosecutor's argument to the jury was the presence of the type A blood.  Id. at 4. As there were no eyewitnesses to the crime, the stained clothing was a "vital component of the case" against the accused, and provided "an important link in the chain of circumstantial

less proven, that any testimony or other evidence that the prosecution presented in the state criminal proceedings was false.

Moreover, the prosecutor's repeated assertion that Schwarz was "broke" – an argument premised on the Citibank records in evidence – does not amount to "manipulation of evidence" in violation of the Fourteenth Amendment.  In contrast to Valentine – where the inconsistent grand jury testimony was not available to the defendant – the TD bank records and other documents that Schwarz argues disproves the prosecutor's claim that Schwarz was "broke" could have been presented by Schwarz during the trial.  Moreover, the prosecutor's remarks during opening and closing arguments are not evidence (see U.S. v. Suarez, 588 F.2d 352, 355 (2d Cir. 1978)), and do not amount to "misrepresentation" under the circumstances.  Finally, the trial court instructed the jury that the lawyers' arguments about the evidence were not themselves evidence.  "What [the lawyers] say, whether questions, or an argument, is not evidence.  So you have the right to accept or reject any lawyer's argument about the evidence, in whole or in part, depending on whether or not you find the argument reasonable, logical, based on the evidence as you recall it and consistent with that evidence."  (St. Ct. Transcript (Dkt. No. 17-17) at 38)

Accordingly, Schwarz is not entitled to habeas relief on the basis of the prosecutor's alleged knowing use of false evidence.

### 2.    Failure to Correct False Testimony

Schwarz contends that the Appellate Division's decision was contrary to and an unreasonable application of Napue v. Illinois, 360 U.S. 264 (1959), which holds that the

---

evidence" that made a "gruesomely emotional impact upon the jury."  Id. at 3-5.  During the habeas proceedings, petitioner was allowed to have the shorts examined by a chemical microanalyst, who found that the stains on the shorts were not blood, but paint.  Id. at 5. Petitioner also established that the prosecutor had known at the time of trial that the shorts were stained with paint rather than blood.  Id. at 6.

prosecution's failure to correct false testimony violates the Fourteenth Amendment.  Id. at 269.

Schwarz asserts that the prosecutor had a duty to correct Yavari's alleged false testimony on

cross-examination, where he claimed that he mentioned – when interviewed by the District

Attorney's Office – that he had been "late in performing the work" required under the original

lease.  (Pet. Br. (Dkt. No. 4) at 60-61; Yavari Testimony, St. Ct. Transcript (Dkt No. 17-4) at

104)  Notes taken by a District Attorney's Office Trial Preparation Assistant of the January 22,

2009 interview, however, reflect that Yavari claimed that he "did things in a timely manner."

(Pet. Br. (Dkt. No. 4) at 61; January 22, 2009 Notes, St. Ct. Records and Proc. (Dkt No. 16-4) at

55)

   In his R & R, Judge Fox recommends that relief on this ground be denied,

because Schwarz did not challenge the Appellate Division's factual finding – presumed to be

correct – that Yavari's testimony was "inconsistent with an interview report," as opposed to

"false."  Schwarz had not cited any federal law requiring a prosecutor to correct "inconsistent,"

as opposed to "false," testimony.  (R & R (Dkt. No. 19) at 12)

   Petitioner objects to the R & R's "reliance on a perceived distinction between

'inconsistent' testimony and 'false' testimony[,]" as the Appellate Division did not reject

petitioner's claim based on any such distinction.  Schwarz also complains that the Appellate

Division's finding that Yavari's testimony was "inconsistent with an interview report" was

"entirely consistent with" the contention that his trial testimony on this point is "false".

(Objections to R&R (Dkt. No. 22) at 10-11)

   As with the knowing use of false evidence, the Fourteenth Amendment prohibits

the State, "although not soliciting false evidence," from allowing it "to go uncorrected when it

appears." Napue, 360 U.S. 264, 269 (l959).  This prohibition applies even when the alleged false testimony relates only to a witness's credibility.  Id.

The law generally does not permit a collateral attack premised on prosecutorial misconduct, however, where the petitioner's argument is "based entirely on evidence of which the defendant was aware, or in the exercise of reasonable diligence should have been aware, at trial."[4]  Helmsley, 985 F.2d at 1208.  Such attacks may be permitted, "despite the existence at trial of some basis for the defendant to suspect the prosecutor's knowing use of false testimony, only where the prosecutor was directly involved in the falsity."[5]  Id.

"[W]hen a prosecutor elicits testimony he or she knows or should know to be false, or allows such testimony to go uncorrected, a showing of prejudice is required.  But the Supreme Court has made clear that prejudice is readily shown in such cases, and the conviction must be set aside unless there is no 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  Shih Wei Su v. Filion, 335 F.3d 119, 126-27 (2d Cir. 2003) (citing United States v. Agurs, 427 U.S. 97, 103 (1976); Giglio v. United States, 405 U.S. 150, 154 (1972)).

---

[4]  "Normally the requirement that a collateral attack must be supported by evidence not available by reasonable diligence at trial applies to claims of a prosecutor's knowing use of false testimony."  Helmsley, 985 F.2d at 1206 (citing United States ex rel. Regina v. LaVallee, 504 F.2d 580 (2d Cir. 1974)).

[5]  The Court announced this rule after reviewing Second Circuit cases that held "in some limited circumstances [that] a defendant's awareness at trial of a prosecutor's knowing use of false testimony does not necessarily preclude a collateral attack."  Helmsley, 985 F.2d at 1206.  In Helmsley, the Second Circuit noted that the defendant "not only is unable to establish a justifiable excuse for her failure to challenge the accountants' testimony at trial, but it appears that her choice not to do so may have been deliberate," and thus found that denial of the new trial claim was proper.  Id. at 1209.  In a subsequent case, the Second Circuit affirmed a grant of habeas relief where a defendant had unsuccessfully attempted to correct false testimony, noting that defense counsel's "failed attempt belies any suggestion of strategic or tactical omission." Jenkins v. Artuz, 294 F.3d 284, 295-296 (2d Cir. 2002).

Here, Schwarz asserts that the prosecutor had a duty to correct Yavari's alleged "false" testimony on cross-examination about the timeliness with which he completed the work specified in the lease.  (Pet. Br. (Dkt. No. 4) at 60-61)  During cross-examination by Giamagas's counsel, Yavari was asked whether he disclosed – when interviewed by the District Attorney's Office on January 22, 2009 – that he was required under the lease to complete renovation work by September 15, 2007:

> Q:    But you didn't mention that there w[as] certain work you were obligated
>       to complete by September 15th, right?
>
> A:    I mentioned that I was late in performing the work which we were doing;
>       it had totally slipped my mind that I had this added – actually at
>       Ekkehart's request it was added – that they wouldn't have to pay rent for
>       one period, which is during construction.
>
> Q:    But you never told D.A. Meadows that you had work that had to be done
>       by September 15, 2007, did you?
>
> A:    No.  I probably not.

(Yavari Testimony, St. Ct. Transcript (Dkt No. 17-4) at 104)

In arguing that this testimony was false, Schwarz relies on notes of the January 22, 2009 District Attorney's Office's interview of Yavari.  The notes of the interview reflect the following:

> Niroo was questioned about his work on the contract, if he held up his end, and if
> he was offered a kickback.  Niroo responded:
>
> - I did things in a timely manner
> - I did things not in the contract, leaks and such
> . . .
> - I was trying to move the project along
> . . .

(January 22, 2009 Notes, St. Ct. Records and Proc. (Dkt No. 16-4) at 55)

While the notes are inconsistent with Yavari's trial testimony, they do not demonstrate that Yavari's trial testimony was false. The notes were not, of course, prepared by Yavari, nor did he subscribe to them. The notes also do not purport to be "a verbatim transcript of the interview." Instead, the notes merely "chronicle[] certain facts and circumstances discussed during the interview and [the author's] impressions thereof." (January 22, 2009 Notes, St. Ct. Records and Proc. (Dkt No. 16-4) at 42)[6]

Whatever the significance of the inconsistency, Schwarz concedes that the January 22, 2009 notes were "part of the state court record" (Pet. Br. (Dkt. No. 4) at 61; January 22, 2009 Notes, St. Ct. Records and Proc. (Dkt No. 16-4) at 55), and were available to him and his lawyer at trial. In these circumstances, Yavari's alleged "false" testimony on this point cannot be the basis for a collateral attack premised on prosecutorial misconduct.

As discussed above, the only exception to this general rule is where "the prosecutor was directly involved in the falsity." Helmsley, 985 F.2d at 1208.

> The exception arises where the prosecutor is claimed not merely to have been aware of circumstances indicating the falsity of a witness's testimony but to have

---

[6] As to the significance of the inconsistency, Schwarz provides contradictory explanations. In his petition, Schwarz suggests that the inconsistency goes to Yavari's credibility, because he told investigators on January 22, 2009, that he performed the work required under the lease in a timely manner, whereas at trial he testified that he told investigators that he "was late in performing the work." (Pet Br. (Dkt. No. 4) at 60-61) Later in his petition, however, Schwarz argues that the testimony at issue involves "a key subject" – "the parties' financial obligations under the lease." (Pet. Br. (Dkt. No. 4) at 72) The latter characterization is incorrect. At trial, Yavari admitted the work delays and Schwarz's right to a rent abatement. (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 100-01; (Dkt. No. 17-5) at 97-101; (Dkt. No. 17-6) at 3, 98) Schwarz has not challenged Yavari's testimony on these points. (Pet. Br. (Dkt. No. 4) at 67)

In any event, as discussed below, the inconsistency between Yavari's trial testimony and notes prepared by someone else cannot support a charge of prosecutorial misconduct. "A mere claim that a witness gave inconsistent testimony is not enough to charge the prosecution's knowing use of false testimony; it may well be that the witness' subsequent statements were true, in which event the claim of inconsistency is not a constitutional objection." Price v. Johnston, 334 U.S. 266, 288 (1948).

been directly involved as a participant in the transaction about which the witness has allegedly lied.  Thus, in <u>Washington</u>, the prosecutor knew the witness had falsely denied a deal because he had made the deal with the witness; in <u>Valentine</u>, the prosecutor knew the grand jury witnesses had testified contrary to the prosecutor's representations because he had elicited their grand jury testimony; and in <u>Mills</u>, the prosecutor knew the witness had falsely denied testifying at the grand jury because he had called her as a witness.

<u>Id.</u> at 1207 (citing <u>United States ex rel. Washington v. Vincent</u>, 525 F.2d 262 (2d Cir. 1975);

<u>United States v. Valentine</u>, 820 F.2d 565 (2d Cir. 1987); <u>Mills v. Scully</u>, 826 F.2d 1192 (2d Cir.

1987)).

Here, Schwarz had access to the January 22, 2009 notes and thus had notice of the

alleged falsity, and not merely "some basis" for suspicion.  Moreover, while the prosecutor

attended the January 22, 2009 interview, this fact does not amount to direct involvement in the

alleged falsity such that collateral attack as in <u>Valentine</u> and <u>Mills</u> is appropriate.  In those cases,

the prosecutor had elicited the inconsistent testimony in grand jury proceedings.

Moreover, while <u>Napue</u> applies even where the false evidence goes only to

credibility, a petitioner must show a "reasonable likelihood [that the alleged false testimony

could] have affected the judgment of the jury."  <u>Giglio v. United States</u>, 405 U.S. 150, 154

(1972).

Having considered the substance of the alleged false testimony, this Court

concludes that Schwarz has not shown "a reasonable likelihood [that the alleged false testimony

could] have affected the judgment of the jury."  As discussed above, the alleged false testimony

does not – contrary to Schwarz's claim – involve "a key subject," that being "the parties'

financial obligations under the lease."  (Pet. Br. (Dkt. No. 4) at 72)  During trial, Yavari admitted

to (1) the owner's renovation work obligation under the original lease; (2) the renters' right to a

three-month rent abatement, plus a one-day abatement for each day the owner was late

completing the renovation work at issue (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 89-90, 95-97, 106; (Dkt. No. 17-5) at 89-90); and (3) his own role in the delay in completing the required work.  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 100-01; (Dkt. No. 17-5) at 97-101; (Dkt. No. 17-6) at 3, 98)

Instead, Schwarz claims that Yavari hid from investigators, during the January 22, 2009 interview, the delay in completing the renovation work.  (Objections (Dkt. No. 22) at 10-11)  But the inconsistency between Yavari's testimony and Greenwood's notes of the interview is not of a nature to raise doubts about the truthfulness of his testimony as a whole, as was the case in the authorities cited by Petitioner.  In Napue, for example, the witness testified falsely about a promised sentence reduction recommendation.  This type of lie is of a nature that there is reason to believe that the jury "might well have concluded that [the witness] had fabricated testimony in order to curry the favor of" the prosecutor.[7]  Napue, 360 U.S. at 270; see also Giglio v. United States, 405 U.S. 150, 154-55 (1972).  In Drake v. Portuondo, 553 F.3d 230, 242, 244 (2d Cir. 2009), an expert witness testified that his opinion "was not difficult" to reach as evidenced by "the brevity of his review."  The witness did not disclose that he had learned the facts of the case in significant detail two weeks before trial.[8]

The testimony at issue in Napue and Drake was such that it would have affected the jury's evaluation of the credibility of the witness's entire testimony.  Drake, 553 F.3d at 244-45.  Such is not the case here.

---

[7]  The Court also noted that "the Assistant State's Attorney himself[, on re-direct,] thought it important to establish before the jury that no official source had promised [the witness] consideration."  Napue, 360 U.S. at 270-71.
[8]  The Court found that the non-disclosure deprived the defense of "a much stronger argument for a continuance or exclusion of [the expert's] testimony."  Drake, 553 F.3d at 245.

While Petitioner contends that Yavari made other inconsistent statements (Pet. Br. (Dkt. No. 4) at 69); that his "credibility was already open to serious question" (id. at 72); and that the prosecutor made other inaccurate statements in summation (id. at 73-74), he has not substantiated these claims.

The Court concludes that Petitioner has not demonstrated a right to <u>habeas</u> relief on the basis of the prosecutor's alleged failure to correct false testimony.

### B.      Ineffective Assistance of Counsel

#### 1.      Alleged Failure to Apply "Prejudice" Prong

Petitioner contends that the Appellate Division's decision is contrary to established federal law in that it does not apply the "prejudice" standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  (Pet. Br. (Dkt. No. 4) at 80-81)  Petitioner further contends that the Appellate Division's findings involve an unreasonable application of <u>Strickland</u>, and an unreasonable determination of facts in light of the record before the Appellate Division.  (Pet. Br. (Dkt. No. 4) at 80-97)

In his R & R, Judge Fox recommends that relief be denied on this ground, as Petitioner's arguments regarding his lawyer's alleged ineffectiveness do not amount to "clear and convincing evidence sufficient to satisfy [Petitioner's] burden of rebutting the presumption of correctness that attends the state court's factual findings."  (R & R (Dkt. No. 19) at 13-14)  Judge Fox also finds that Petitioner has not established that "the Appellate Division's determination of his ineffective assistance of counsel claim involved an unreasonable application of clearly established federal law."  (R & R (Dkt. No. 19) at 14)  Judge Fox notes that Petitioner has not cited any Supreme Court case supporting his contention that "the Appellate Division's prejudice

inquiry was unreasonable because 'it consisted entirely of. . . conclusory pronouncements.'"  (R & R (Dkt. No. 19) at 14)

In his Objections, Petitioner argues that Judge Fox (1) failed to address his contention that the Appellate Division applied a "prejudice" standard inconsistent with Strickland (Objections to R & R (Dkt. No. 22) at 13); (2) erred in dismissing his "unreasonable application" arguments as conclusory and as reflecting a mere "disagreement with the Appellate Division's assessment of the record" (Objections to R & R (Dkt. No. 22) at 13-15); and (3) in addressing the "unreasonable determination of facts" issue, erred in finding that (a) counsel's alleged omissions were adequately pursued by Petitioner's co-defendants, and (b) the Appellate Division's factual conclusion that the omissions were of "minor significance" is entitled to a presumption of correctness.  (Objections to R & R (Dkt. No. 22) at 15-17)

To establish ineffective assistance of counsel, a petitioner must demonstrate that: (1) "counsel's representation fell below an objective standard of reasonableness" (performance prong); and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (prejudice prong).  Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).

"[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances," with "[p]revailing norms of practice" serving as "guides to determining what is reasonable."  Id. at 688.  Judicial scrutiny of counsel's performance "must be highly deferential."  Id. at 689.  To prevail on an ineffective assistance of counsel claim, a petitioner must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," that is, that the challenged conduct, under the circumstances, "might be considered sound litigation strategy."  Id.

"A reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Id</u>. at 694.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  <u>Id</u>. at 686.

"Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d)" is difficult, because both standards are "highly deferential."  When the standards are applied in tandem, review is "doubly so."  <u>Harrington v. Richter</u>, 562 U.S. 86, 105 (2011).  Accordingly, in reviewing a state court decision, the question is "whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," and not "whether counsel's actions were reasonable" per the <u>Strickland</u> standard.  <u>Id</u>.  "The question 'is not whether a federal court believes the state court's determination' under Strickland 'was incorrect but whether [it] was unreasonable--a substantially higher threshold.'"  <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (citing <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007)).  As <u>Strickland</u> is a general standard, "a state court has even more latitude to reasonably determine that a defendant has not satisfied  that standard."  <u>Knowles</u>, 556 U.S. at 123.  In sum, to prevail on an ineffective assistance of counsel claim, a <u>habeas</u> petitioner must show that the state court applied <u>Strickland</u> "in an objectively unreasonable manner."  <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002).

In rejecting Schwarz's ineffective assistance of counsel claim, the Appellate Division states:

> The [trial] court properly denied Schwarz's CPL 440.10 motion, in which he alleged ineffective assistance of counsel.  The trial record and the submissions on the motion establish that Schwarz received effective assistance under the state and federal standards (<u>see</u> <u>People v. Benevento</u>, 91 N.Y.2d 708, 713-714, 697 N.E.2d 584, 674 N.Y.S.2d 629 [1998]; <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]).  Schwarz has not shown that any of his

> counsel's alleged deficiencies fell below an objective standard of reasonableness,
> or that, viewed individually or collectively, they deprived him of a fair trial or
> affected the outcome of the case."

People v. Gogoladze, 114 A.D.3d 417, 418, 980 N.Y.S.2d 40, 41-42 (App. Div. 1st Dep't

2014).

   From the language of the decision itself, it is evident that the Appellate Division

applied the federal standard set forth in Strickland.  And – contrary to Petitioner's contention –

the reference to whether counsel's alleged errors "deprived him of a fair trial or affected the

outcome of the case" is an obvious reference to Strickland.  (See Pet. Br. (Dkt. No. 4) at 80).

Strickland acknowledges that a "fair trial" is the "guide" in giving meaning to the constitutional

requirement of effective assistance of counsel, and Strickland's "prejudice" test focuses on

outcome – whether there is a "reasonable probability that . . . the result of the proceeding would

have been different."  Strickland, 466 U.S. at 687, 694.  Given that this Court must give the

Appellate Division's decision "the benefit of the doubt," its ruling on the "prejudice" prong must

be read to have applied the Strickland standard, despite its failure to explicitly cite the

"reasonable probability" test.  In light of the Appellate Division's express reference to "federal

standards" and specific case citation, this is the only reasonable conclusion.  Woodford, 537 U.S.

at 24.

   The cases cited by Petitioner are not to the contrary.  In these decisions, state

courts either categorically reject application of Strickland or expressly state a different standard

without any reference to Strickland.  (Pet. Br. (Dkt. No. 4) at 51, 80)  In Williams v. Taylor, for

example, the Supreme Court held that the Virginia Supreme Court had erred by analyzing an

ineffective assistance claim under an incorrect standard.  Williams, 529 U.S. at 394.  The

Virginia court improperly held that the Supreme Court's decision in Lockhart v. Fretwell, 506

U.S. 364 (1993) "modified or in some way supplanted the rule set down in Strickland," id. at 391, and read Lockhart to "require a separate inquiry into fundamental fairness even when [defendant was] able to show that his lawyer was ineffective and that his ineffectiveness probably affected the outcome of the proceeding." Id. at 393. While the Virginia court was – per Lockhart – permitted to conduct an "outcome determinative" analysis, "the court's decision turned on its erroneous view that a 'mere' difference in outcome [as required by Strickland] is not sufficient to establish constitutionally ineffective assistance of counsel." Id. at 397. The Virginia court's analysis was both contrary to and an "unreasonable application of" clear law articulated by the Supreme Court. Id. at 397, 399.

Similarly, in Lafler v. Cooper, the "Michigan Court of Appeals identified respondent's ineffective-assistance-of-counsel claim but failed to apply Strickland to assess it . . . . After stating the incorrect standard, moreover, the state court then made an irrelevant observation about counsel's performance at trial and mischaracterized respondent's claim as a complaint that his attorney did not obtain a more favorable plea bargain. By failing to apply Strickland to assess the ineffective-assistance-of-counsel claim respondent raised, the state court's adjudication was contrary to clearly established federal law." Lafler v. Cooper, 566 U.S. 156, 173 (2012).

Here, the Court concludes that Petitioner has not demonstrated that the Appellate Division failed to apply the Strickland standard.

### 2. Unreasonable Application of *Strickland*

Petitioner also argues that the Appellate Division did not reasonably apply the Strickland standard. In claiming ineffective assistance of counsel, Petitioner points to his lawyer's failure to (1) question Yavari about his inconsistent statements during the January 22,

2009 interview regarding his supposed timely completion of the owner's work (Pet. Br. (Dkt. No. 4) at 84); (2) impeach Yavari with a May 1, 2009 affidavit, in which Yavari did not contest the tenants' affirmative defense premised on the rent abatement provision, in order to refute his testimony that he forgot about the rent abatement provision until shortly before trial (Pet. Br. (Dkt. No. 4) at 85); (3) substantiate Schwarz's argument that Yavari had willingly given him the checks (id. at 85-87); (4) refute the prosecutor's claim that Petitioner was "broke" by introducing the TD Bank records (id. at 86); and (5) argue that theft of unpaid rent was not a cognizable crime and cite relevant case law for the argument that the lease amendment was not "property" under state law.  (Id. at 89-90).  Petitioner further claims that counsel mistakenly stated in summation that both of the computers seized belonged to Petitioner, when the evidence showed that one of the computers belonged to Giamagas.  (Id. at 88; St. Ct. Transcript (Dkt. No. 17-15) at 22-23, 32)

In connection with these issues, the Appellate Division ruled as follows:

> Schwarz has not shown that any of his counsel's alleged deficiencies fell below an objective standard of reasonableness, or that, viewed individually or collectively, they deprived him of a fair trial or affected the outcome of the case. In particular, many of Schwarz's lawyer's alleged omissions involved matters that were adequately pursued by the lawyers for Gogoladze and the other jointly tried codefendant, and Schwarz has not established that his counsel's failure to duplicate cocounsels' efforts was objectively unreasonable, or that it caused any prejudice.  Schwarz's counsel's other alleged errors and omissions were of minor significance.

People v. Gogoladze, 114 A.D.3d 417, 417-18 (1st Dept. 2014) (internal citations omitted).

Applying the "doubly deferential" review rule, this Court finds that – given the character of the complained acts and omissions – it is not objectively unreasonable to conclude that Petitioner's counsel's representation did not fall below "an objective standard of

reasonableness" (performance prong) and/or there is no" reasonable probability" that "the result of the proceeding would have been different" but for such acts or omissions (prejudice prong).

As an initial matter, and as discussed above, Yavari's alleged testimony regarding the January 22, 2009 interview – about which counsel failed to inquire further – was not significant.  Yavari admitted at trial the owner's renovation work obligation under the original lease; the renters' right to a three-month rent abatement and extension for non-completion of work (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 89-90, 102; (Dkt. No. 17-5) at 89-90); and his own delay in completing the required work (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-2) at 100-01; (Dkt. No. 17-5) at 97-101; (Dkt. No. 17-6) at 3, 98).  Petitioner does not challenge Yavari's testimony on any of these points.  (Pet. Br. (Dkt. No. 4) at 67)  The supposed falsity relates only to statements Yavari made during the January 22, 2009 interview in which – according to notes taken by another attendee – he stated that the renovation work had been performed in a timely manner.  Acknowledging the inconsistency, it was of little import, because at trial Yavari admitted all of the relevant facts concerning the delay in completing the renovation work.

As to counsel's failure to introduce the TD Bank records to refute the accusation that Schwarz was "broke," there is evidence that Schwarz had depleted the TD Bank account by more than $120,000 in the first month after it was opened, and that the balance in the account had fallen to a little over $38,000 by early March 2009.  The steep fall in the account balance was caused by Schwarz writing numerous checks to himself or his business accounts to pay for various expenses.  (St. Ct. Records and Proceedings (Dkt. No. 16-4) at 101-113; (Dkt. No. 16-5) at 1-10).  Accordingly, introducing the TD Bank records presented a risk of buttressing the prosecutor's argument that Petitioner was running out of cash.

Moreover, as Petitioner concedes, the defense theory at trial was to establish that "Yavari lied to the investigators about the parties' financial obligations under the lease and falsely accused Giamagas and Schwarz of victimizing him in a desperate attempt to blame them for his many, costly shortcomings as property manager."  (Pet. Br. (Dkt. No. 4) at 72-73)  Thus, it was reasonable for his lawyer, as a matter of strategy, to focus on Yavari's conduct manifesting such motives, instead of disputing facts relating to Petitioner's supposed motive. This is especially true given that the TD Bank records tended to support, rather than undermine, the prosecutor's assertion that Schwarz's financial condition was poor.

Petitioner also criticizes his lawyer's failure to impeach Yavari's assertion that "that he had forgotten all about [the rent abatement] provision until shortly before trial."  In a May 2009 affidavit, Yavari mentions the rate abatement.  (Pet. Br. (Dkt. No. 4) at 85)  During cross-examination, Petitioner's counsel asked Yavari whether he remembered the rent abatement provision, and Yavari replied that "sometime in March of -- late March, early April of 2009 after [Yavari] reviewed it[, he remembered it]."  (Yavari Testimony, St. Ct. Transcript (Dkt. No. 17-5) at 90)  Given Yavari's testimony on this point, the May 1, 2009 affidavit would not have impeached him.

Petitioner also faults his lawyer for failing to substantiate the argument that Yavari had willingly given Petitioner the checks.  Petitioner contends that statements Yavari made during his January 22, 2009 interview and in a recorded conversation with Giamagas support this argument.  (Pet. Br. (Dkt. No. 4) at 85-87)  Petitioner has not demonstrated that Yavari made statements during the January 22, 2009 interview that support this claim, however. Notes of the January 22, 2009 interview indicate that Yavari described the "torture"-like setting

he was shown at the apartment, which preceded the demand for the checks.  (January 22, 2009

Notes, St. Ct. Records and Proc. (Dkt No. 16-4) at 49)

As to the recorded conversation, Petitioner's counsel argued during summation

that

> [d]uring the entire conversation, [Yavari] never, never states the obvious:  Why did you stick a gun in my face?  He never asked the real questions because he knows he's being taped, and he doesn't want the answers going out, all right, because that exposes him. That will expose him to be the liar.
>
> You have to examine the tape and not fall for some of the, oh, you know, he touched – you know – he must have been worried about you being wired up because he touched a button on your jacket.  Well, he had a burn in his jacket.  There must be something sinister.  It must be.  He's trying to search for a wire?
>
> Well, that tells you on its face if he's worried about being wired up, don't you think he would have searched him?  He never asked the real questions because he knows people are listening.  Okay.

(St. Ct. Transcript (Dkt. No. 17-15) at 28)  In short, counsel made effective use of the

taped conversation in his summation.

Petitioner also complains that his lawyer mistakenly stated in summation that both

of the seized computers belonged to petitioner, when the evidence showed that one of the

computers belonged to Giamagas.  (Pet. Br. (Dkt. No. 4) at 88; St. Ct. Transcript (Dkt. No. 17-

15) at 22-23, 32)  As discussed above, the trial court instructed the jury that the lawyers' closing

arguments are not evidence.  (St. Ct. Transcript (Dkt. No. 17-17) at 38)  In any event, during his

summation, Schwarz's counsel argued that Schwarz did not use either computer:

> And they say Ekkehart Schwarz.  But when you review the computers, everything says Ekkehart Schwarz because it's all his.  It doesn't mean he's using it.
>
> You know, Giamagas lives in his house, or lived there before.  He moved, has access to everything.

(St. Ct. Transcript (Dkt. No. 17-15) at 22-23)

As to Petitioner's complaint that his lawyer should have argued that theft of unpaid rent is not a cognizable crime, and that the lease amendment is not "property" under state law (Pet. Br. (Dkt. No. 4) at 89-90), Petitioner was not convicted of the larceny counts, which the trial court declined to submit to the jury.  Accordingly, Petitioner suffered no prejudice as a result of counsel's conduct.

In sum, Petitioner has not demonstrated that the Appellate Division's application of <u>Strickland</u> is unreasonable.

### 3.      <u>Unreasonable Determination of Facts</u>

The Appellate Division found that "many of Schwarz's lawyer's alleged omissions involved matters that were adequately pursued by the lawyers for Gogoladze and the other jointly tried codefendant."  <u>People v. Gogoladze</u>, 114 A.D.3d 417, 418 (1st Dept. 2014) (internal citations omitted).  Schwarz contends that this factual determination was unreasonable.

Petitioner has not met his burden to show by clear and convincing evidence that the presumption of correctness should not apply to the Appellate Division's factual finding.  28 U.S.C. § 2254(e)(1).  There is evidence that Schwarz's co-defendants' counsel emphasized some of the issues that Schwarz claims his lawyer ignored, such as the implausibility of Yavari forgetting about the rent abatement provision (St. Ct. Transcript (Dkt. No. 17-14) at 127-28), and Yavari's "dancing around" during the recorded conversation, avoiding any mention of the alleged "torture" threat.  (St. Ct. Transcript (Dkt. No. 17-15) at 102)  As to the other alleged omissions cited by Schwarz, as discussed above, his lawyer addressed these matters on summation.

The Court concludes that Schwarz is not entitled to <u>habeas</u> relief on the basis of ineffective assistance of counsel.

## <u>CONCLUSION</u>

Magistrate Judge Fox's Report and Recommendation (Dkt. No. 19) is adopted in its entirety.  Schwarz's petition for a writ of <u>habeas corpus</u> is denied.

Because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue under 28 U.S.C. § 2253.  This Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore <u>in</u> <u>forma</u> <u>pauperis</u> status is denied for the purpose of an appeal.  <u>Cf.</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a non-frivolous issue).  The Clerk of Court is directed to close this case.

Dated:  New York, New York
   September 10, 2020      SO ORDERED.

              Paul G. Gardephe
              United States District Judge